The next matter, No. 24-2000, Yoon Doelger, et al. v. JPMorgan Chase Bank, N.A. et al. At this time, would counsel for appellants please introduce themselves on the record to begin? Good morning, your honors. James Saratella from Kim and Saratella LLP on behalf of appellants Yoon Doelger and Peter Doelger. May it please the court. The district court's decision was a misapprehension of Massachusetts law and a gross misapplication of the summary judgment standard. Upholding this erroneous decision would have devastating consequences for investor protection across the commonwealth and beyond. And I want to start with where we agree here. Defendants, JPMorgan Chase and Chickasaw Capital Management were investment advisors with fiduciary duties. And what does it mean to be a fiduciary in the investment context? It means you have a duty of loyalty where you have to put your clients' interests ahead of your own, and it means you have a duty of care. And what is the duty of care in the investment context? It means you have to give investment advice that is in the best interest of your clients, and you also have to give suitable advice on an ongoing basis. And what is suitability? I want to focus on that because there seems to be all of a sudden some disagreement on that issue that we didn't have below. But suitability, when an investment advisor gives advice to a client, there are certain information about the client that they have to collect. What is the client's investment objectives? What is the client's financial circumstances, like net worth? What is the risk tolerance of the client? What is the age? What is their investment experience? This is common stuff in the industry. When you say that there's agreement, no debate, that the defendant was a fiduciary, are you that were outside of the decisions made within the MLP investment vehicle? So what the defendants are arguing is that they could somehow limit their fiduciary duties, not that there wasn't a fiduciary duty. So there is a debate as to the extent of the scope of the fiduciary duties. So plaintiff's position is that what defendants are arguing is not that they were shaping the so-called scope of a duty, that they were all but eliminating it. That's their position. Well, isn't the status quo, Andy, that brokers are generally not regarded as fiduciaries? So that's correct. Let's talk about Robin Hood, because in the SJC, the court went through that exact analysis. Traditionally, brokers did not have a fiduciary duty. They were subject to a low standard of suitability. Investment advisors, as Robin Hood laid out, the SJC talked about this, they have the full complement of fiduciary duties. They're all the way up here. Over time, what has happened with regulatory adjustments, changes in the law, brokers have moved up, closer to investment advisors. Again, brokers always had that suitability obligation. Now, what defendants are trying to argue is that investment advisors are down below what brokers originally were. It's absurd. They're saying that an investment advisor would have less obligations than a broker. The only real support that they cite for that is an Advisors Act release by the SJC, which doesn't say that. It says that an investment advisor could shape its relationship by agreement. But if you look at that in the context of the Advisors Act release, it is talking about that in connection with unwaivable fiduciary duties. But aren't you taking as a given that with respect to the entire scope of the relationship, they were an investment advisor rather than a broker? They were not a broker. And so let's talk about what a broker is, right? But you're saying they were an investment advisor. That's correct. And you read, is there any documentation that you point to that would confirm that they're acting as an investment advisor outside the MLP investment vehicle? Okay. So let's start with Chickasaw. That's the easy one. If you look at this Ames Agreement that my clients were not a party to, that Chickasaw was a party to with J.P. Morgan. But that's inside the MLP vehicle. No, it's not. The Ames doesn't talk about MLPs. It talks about they had fiduciary duties fully under the Investment Advisors Act. That's what the Ames says. And in the record, Chickasaw has acknowledged they have fiduciary duties. There's no discussion of limitation as to a certain vehicle. And it doesn't work anyway because what is suitability? Let's go back to suitability. You have to do an analysis as an advisor as to an investment that's suitable for your client. It's at the client level. It's not at the investment level or the type of securities that you're investing in. It's not about that. It's about collecting an investment profile for that client. And you have an ongoing obligation to provide suitable advice. Chickasaw's expert, Gillespie, testified to this. And he agreed with plaintiff's view of an ongoing suitability analysis or obligation by the investment advisors. They're not brokers. And Gillespie also said they're investment advisors. Both Chickasaw and J.P. Morgan. And if we look at the agreement... Counsel, can I ask you to, just because we have limited time, to focus in on what exactly are the breaches that you are alleging here? And in particular, it would be helpful if you could explain if the factual basis for your breach of contract claims is different than the factual basis for your breach of fiduciary duty claims to really focus in on what exactly you think, for lack of a better word, J.P. Morgan, she's did wrong here, and whether it's different for the breach of contract versus breach of fiduciary duty. So, we'll start with the contract. Let's start with the contract. And the parties disagree on the J.P. Morgan contract and what it means. Chickasaw's not a party to that contract. That's clear. No one disputes that. But what the contract says is just what I was discussing about suitability. 1A in the contract says there's suitability factors that the bank has to collect. 1C talks about how there's a suitability analysis that they have to do with the client and work with the client to present suitable portfolios. Expert Gillespie agrees with this reading. The record is replete with examples of how J.P. Morgan didn't even know what the investment objectives... James Baker gave three different examples of what he thought Peter's investment objectives were. That's disputed. They never collect an investment profile for you. They don't even deny it. So, that's a breach right there. And then another fundamental breach is in 1E of the agreement. It says that they had an ongoing suitability obligation. So, one point in time, which is a real game changer in this case, is that in 2016, when James Baker was required to do a personal financial statement for Peter, because he was pushing him into this swap, he sat down with him and he wrote down in his handwriting all of the assets that Peter had. It showed his net worth, total net worth of $39 million, liquid net worth of $21 million, way less than the $100 million. It's $80 million less than the $100 million that Baker said a year earlier, which we put plenty of evidence in the record how that was a lie. And he knew it. Peter said, I don't know my net worth. Call the accountant. Baker never did that. A year later, it confirms what Baker knew all along. It was untrue. So, at that point in time, what was Baker supposed to do? Expert Gillespie confirmed it. A complete new suitability reevaluation. No suitability evaluation was done when you joined the account in 2019.  So, those are examples of breaches of the suitability obligation. But I want to take it broader. But just to make sure I understand, so the two breaches you've just described are a failure to do a suitability analysis in 2019 for Plaintiff U and then a failure to do one in 2016. And 2015 when Peter was never done. That they just weren't done. Those are the breaches that you're alleging. That's under the contract, some of the breaches. So, but we need to go further. Because even all the cases that defendants cite, the New York cases, for instance, talk about how a fiduciary duty transcends the contract. You're not just limited to what the contract says because you can't contract away your duty of loyalty and your duty of care. And that very SEC guidance that they talk about discusses this. So, what breaches do you point to for that? Okay. So, duty of care. Let's start with the red line email that's in the record. I'm not going to belabor that. That was a fraudulent act. And the district court said, oh, it's not incontrovertible evidence of fraud. Yes, it is, but that's not even the standard on summary judgment. So, there's a breach right there of the duty of care. And then going forward, there were multiple breaches of duty of care and duty of loyalty. James Baker was telling the client for a year, you're making $2 million a year in income, which was untrue. They were paying, they were only making around $400,000 in dividend payments because it was mostly a return of capital. And the reality was that was not true. And they were paying $500,000 in interest on loans that were the MLP investments served as collateral. And JP Morgan was the lender. And the record is replete with examples of JP Morgan not wanting the doldgers to pay down the line of credit because they didn't want to lose the money. James Baker told the doldgers, hawk your house instead of selling MLPs. That is a violation of the duty of care and the duty of loyalty. JP Morgan is blatantly looking out for its own interests. There's a 2017 email that is in the addendum of the defendants. And James Baker said, move $2 million of your savings into the collateral pool so that you can fend off a margin call. Don't sell MLPs, use your savings. That was the advice. Those are just some of the examples of duty of loyalty and duty of care breaches. But I do want to talk about some of these cases because I think it's really important. Let me just ask you a more general question that maybe you'll answer with the case law. I guess I'm having trouble sort of in understanding what you are relying on or what we should rely on to find that there were fiduciary duties here that equate to the fiduciary duties of investment advisors. Where would you direct us to sort of to look to determine what those duties are? Start with Robinhood. It says, the SJC says it. Investment advisors have fiduciary duties. They're by-law fiduciaries. That's not in dispute. Chickasaw is a registered investment advisor under the Advisors Act. It has fiduciary duties. J.P. Morgan was operating under regulations of the OCC, which also says they have fiduciary duties. The OCC has guidance similar to the SEC that's in line with it and Expert Gillespie testified about this. J.P. Morgan was supposed to have a fiduciary wall. They're not allowed to have the commercial banking side share material information with the advisory side, the fiduciary side. They trampled all over that wall. There's a reason why those parameters are set in place. And it's not about that gives rise to the fiduciary duty, as the defendants want to argue. That's not what we're saying. The regulations and the policies are evidence of breaches, failures to follow them. That's what our experts said. That's what their experts talked about. So you have to follow your policies. That gives evidence of breach. But it's well-established under Massachusetts law, under guidance from the SEC and OCC, that if you have discretion, like go to the Patso's case, what was really at issue in the Patso's case? They completely, and in a very uncredible way, talk about that case. That case is not about limiting discretion. And in any event, the agreement here said they had full discretion. That's what 1D says. The Patso's case was just about whether a broker has a fiduciary duty. What do you look to? Does the broker have discretion? And if it does, then it does have a fiduciary duty. So here, we're way beyond that. What transaction did one of the defendants make without notice and consent and agreement of your client? So it's not about in terms of that's not what we're alleging. We're alleging as an investment advisor. So I take it the answer is there were none. That's correct. But what an investment advisor's obligation to do with a client is, they're supposed to disclose information. They're supposed to give suitable advice. I mean, there are multiple examples here. The other side says that they tried to talk them out of putting so much money into MLPs. And in fact, they put it in writing. And he insisted he did. He'd had some good experience in previously investing in them. That's disputed, Your Honor. And they never did that for you. This big boy letter that they called it was really. And to take a step back, they knew all that information. The big boy letter was not true. They couldn't rely on it. And there's plenty of evidence in the record. Didn't they send the letter to your client's lawyer? They did the day before a meeting. But the lawyer testified he never gave advice to the client on it. No, but they gave it to his lawyer. What more could they do? So again, what are their obligations as an investment advisor? It's not to do a CYA letter. It's to do a suitability analysis. They didn't do that for Peter. They didn't do that for Yoon. And so that, may I continue? Please finish answering the question. It's not enough just to send a letter to say, this is a get out of jail free card for us. The record actually shows that Peter went to them and said, I want to diversify. And their response to him was, death is the best answer for diversifying or getting out of tax issues with MLPs. That was their response. And later in 2017 and 2019, it's in the record in our addendum with the advisor Doug Moon. The Doldres made it clear they were open to other investments. But J.P. Morgan kept saying, take out a HELOC, hawk your house, move money over, don't sell MLPs. That was never the primary vice. The Doldres were relying on J.P. Morgan to give them advice. And they didn't give them suitable advice. Counsel, can I ask you one other question that I think applies to a number of your claims? Opposing counsel has argued that many of your claims have causation as an element, and that you essentially waived any argument about how causation has been satisfied here, because in front of the magistrate judge, you didn't respond in opposition to their summary judgment motion on causation, on the causation prong. Can you give us your position on that? Because many of the claims, as I'm sure you recognize, do, in fact, include a causation element. So what's your best response to that argument? So first of all, we did respond, and we made it very clear in a SIR reply what our position is. And causation is almost always an issue of fact to begin with. But causation is not what it's not. They have no legal support for their argument on causation. They're trying to argue that had the Doldres not hired J.P.  I guess my question is a little bit different, not about their argument. But if you didn't respond in your opposition to their summary judgment motion on causation to show that there was a genuine dispute of material fact about whether causation existed, why wasn't that a waiver under our case law? We did respond. You said in a SIR reply. Our position was we responded in the opposition, and we had a SIR reply. We made it even more clear there. And neither judge said we waived it. Neither judge. So your position is that if we look at the opposition to the summary judgment motion, there is argument about causation. We argue that the Doldres had losses as a result of their bad investment advice. Thank you. Your time is up. Thank you, counsel. At this time, would counsel for the Appalachian J.P. Morgan Chase Bank please introduce herself on the record to begin? Good morning, Judge Montecalvo, Judge Cayotta, Judge Riggleman. My name is Tracy Appleton. I'm from Nosh Wolf Appleton. I appear on behalf of J.P. Morgan Chase Bank N.A. But I will be arguing on behalf of both J.P. Morgan and Chickasaw, though Chickasaw's counsel is present in this case.     If you have questions for him in particular. I'm also here to speak on behalf of James Baker and the other dedicated representatives whose reputations have been unfairly maligned in this action. I believe that Judge Cayotta came right to the point when he asked, what exactly is the scope of fiduciary duties here? The way that plaintiffs are trying to justify their case is by saying that this is an all or nothing proposition. Either you have every fiduciary duty under the sun or you have none. The only way that that list of actions can qualify as breaches is if there is a limitless sense of fiduciary duty. Here there was not a limitless sense of fiduciary duty because there was limited discretion. And under POTSOS, under Massachusetts law, under New York law, the scope of fiduciary duty is based on your agreement and based on the discretion that you could exercise. In this case, Mr. Dolger, a wealthy individual, amassed a concentrated leveraged MLP investment strategy through 2014 that garnered him tens of millions of dollars in gains way outpacing the S&P 500. He decided, instead of selling those gains and paying the taxes on them, that he would continue with that strategy. And so as Judge Kayada pointed out, he signed this MLP agreement with JP Morgan. And that agreement specifically limited the defendants to choosing and helping manage MLPs within his existing portfolio. It specifically barred the defendants from diversifying and it barred the defendants from changing that MLP concentration. And there was a letter that JP Morgan sent. It was shared with Mr. Dolger's lawyer and also with Mrs. Dolger at their account. And that email, excuse me, that letter could not possibly have been clearer. That letter urged Mr. Dolger to diversify. That letter said you should have no more than 5% of your net worth in MLPs. And it told him that it did not recommend his process and instead recommended diversification. Mr. Dolger, in turn, in writing confirmed that his existing MLP investments were suitable for him in light of his investment objectives. And- Counsel, can I just ask you to help me zero in where exactly in the advisory account agreement or tell me if I'm looking at the wrong document, does it say the language that you talked about both right now and in your brief that JP Morgan Chase's discretion was limited? What, where exactly does it say that? Certainly, Judge Rickleman, I don't have it in front of me, but the, I believe it's section 1D1 says that the account will be managed according to the JP Morgan's discretion subject to the annexed portfolio. That is the part that limits their ability to invest in other things. There is an annexed portfolio that identifies what will be invested in. It is that MLPEI portfolio, and it gives a definition that is the equivalent of MLPs. So it's really the annexed portfolio that is really, what's limiting the discretion then? That's exactly right. And that's the way that this program works, where there are a series of different portfolios. They're called sleeve investments. Advisor, excuse me, clients can choose a particular investment strategy and they pick the portfolio according to that strategy. Mr. Dolger was not interested in any other strategy other than the MLP strategy that he had already pursued for years. And so that is why that MLP portfolio strategy was the one that was offered to him. Mr. Dolger did make clear that if the MLP strategy was not offered to him, that he would continue with Atlantic Trust, his other advisor, and that he would continue with his MLP investments. As far as Massachusetts law is concerned, we think it is abundantly clear that under Massachusetts law and under New York law that discretion is the sine qua non of fiduciary duty. I think that's from the Kriegel case, which is a Massachusetts case. We've cited Butts, we've cited Miriam. On the New York side, we've cited Zorbas and Guerin-Hermé, which are two cases that are very similar to the circumstances in this case. All of those cases stand for the reasonable proposition that fiduciary duty has to be limited by your discretion. In fact, if this court were to rule that the discretion, that the fiduciary duties were limitless here, that would make investment managers the only fiduciary in Massachusetts or anywhere that was incapable of defining the scope of a fiduciary relationship by contract and by discretion. What do you say, there's a March 11, 2020 email from, I think it's from Mr. Baker, Jimmy Baker, where he says, we have been, we are their primary financial advisors, bank and investment advisor. How are we to interpret that? So that is an email I believe Mr. Baker sent internally in order to attempt to talk to the bank at JPMC about allowing the Dulges to get a HELOC. That's not a communication to the plaintiffs, it's an internal communication. And what they, what he recognizes that they were an advisor and that they also provided banking, Protestant banking solutions. In this relationship, and again, I would point to Zorbas, I would point to Guérin-Hermé. The way this relationship works is the advisory account allowed limited discretion. The discretion was to be able to manage the MLPs. The other help that JP Morgan provided in terms of banking, in terms of derivative swaps, that is expressly a non-fiduciary role. In fact, there are not cases holding that such banking activities constitute fiduciary activities. And so when Mr. Baker said, we have an advisor role and also a banking role, he is drawing that distinction. Now, with respect to what that means in terms of his fiduciary duties, the first thing is that the agreements made extremely clear where the fiduciary obligations lie. And they lay within that limited discretion within the investment management agreement. All of the loan documents made extremely clear that the bank was not acting in a fiduciary capacity. It took no responsibility for the collateral that was the security for the loans. The derivative swaps as well, the agreements made extremely clear that they were not acting in a fiduciary capacity. And so when you look at the Davidson case, for example, it is clear in terms of a fiduciary relationship. When the agreement says that you, the client are responsible for certain things, you cannot have a fiduciary relationship making the other side responsible for those things. And so, Judge Kayada, that's how I would respond to that email. I do want to explain something about suitability. Suitability as a term is an SEC term under the IAA. It doesn't strictly apply to J.P. Morgan, but I think it's important to understand exactly what it means. What it means is to, well, there are a couple of things. First, as Mr. Serratella said, you gather information and that information includes a client's investment objectives. This is not an objective standard. Suitability is not looking at a client saying, this is how I would do your account. What it is, is finding out from a client, what do you want to do? What are your goals? What are your abilities to take on risk or not to take on risk? And here, Mr. Dolger was abundantly clear that his goal was to maintain his existing MLP strategy. That was his investment objective. And Mr. Dolger determined what was suitable for him. And that is why, despite J.P. Morgan telling Mr. Dolger in 2015 that they did not recommend he continue this concentration, it was Mr. Dolger's right to determine for himself what was suitable for him. Plaintiff's counsel says that you had an obligation to reassess suitability at various points in time, that it's not appropriate to just sort of say, we did it five years ago and we'll just assume everything. We'll kind of put a blind eye to whether anything has changed. What do you say in response to that? Certainly, Judge Rickleman, I would say two things. First, that is not supported under the case law. There's not a case cited for that proposition that there's a continuing suitability reevaluation obligation. They cite Mr. Gillespie, who is an expert for Chickasaw. He was retained to address Chickasaw's industry standards. He did not look at J.P. Morgan documents. He did not do the analysis necessary to be an expert for J.P. Morgan. And so anything he said about J.P. Morgan was outside the scope. And indeed, he said he was not representing opinions for J.P. Morgan. For that reason, because of ipsa dixit, because he can't comment on legal analysis, he cannot talk about the suitability. But Judge Rickleman, when we look at these two years that Mr. Saratella pointed out, in 2016, the idea that there was another suitability analysis required, first, that is based on an application that was given to the bank for a derivative swap. That was not Mr. Saratella complained that we were sharing too much information between the departments. So this is a different department that has that 2016 personal financial statement. But if they had looked at that personal financial statement, what they would have determined is, once again, we still feel that your MLP concentration is too high. They already said that in 2015. There would be no new suitability analysis. The recommendation is the same. We do not recommend that you have such a concentration. And there is no suitability obligation unless you make an affirmative recommendation. And if you look at paragraph 108 of the 56-1 statements, you will see that not once are plaintiffs able to point out a time where J.P. Morgan, where any defendant, recommended holding onto the MLPs or increasing MLPs. And I would encourage your honors to look at the record itself and the evidence itself if you have questions about that. In 2019. Mr. Saratella told us a few minutes ago that there were certain smaller transactions, such as whether to take some savings as opposed to liquidating some of the MLPs that they did give advice on. I believe the 2017, I hope I get this right, he's mentioned a particular 2017 email, I think, Judge Kayada, that you're referring to. That one recommended moving money out of an account into a different account to take them out of a margin call. So there is no damage in doing what he recommended. And he actually repeatedly recommended that they pay down the line of credit. I believe in that same email, he also recommended every quarter taking out a certain amount of money from the MLPs and paying off more of the line of credit. In a different email, he recommended selling $2.5 to $5 million in MLPs to pay down the line of credit. So looking at the email itself, it is clear there was no recommendation to try to hold or increase MLPs or to hold or increase their debt. That's what that actual email says. And I don't want to forget, Judge Rickleman, the 2019 point, which is very important. The plaintiffs, in their reply, have suggested that the defendants have forgotten Yuen. The defendants have not forgotten Yuen. In fact, if you look at the opening brief, there are no Yuen-specific arguments made substantively on appeal. We addressed issues below, but they weren't made on appeal. So it wasn't ignoring Mrs. Dolger, that argument wasn't made in the opening brief. But what happened in 2019 with Mrs. Dolger is that she became a joint owner of an existing investment. There was not a suitability obligation there because no recommendation was made and because she was not making a new investment. All that process had already occurred. That MLPEI investment was already there. And so there's not an obligation to do a new assessment. She is simply becoming a joint owner. And if you look, I believe it's JA 586, but it is section one of the general obligations of the terms. That makes clear that any joint owner is bound by all the existing obligations of the other owners. That includes all the obligations Mr. Dolger entered into. That includes the representations that Mr. Dolger made in the MLPEI letter about his investment objectives. And finally, I believe it's paragraphs 148 and 149 of the 56-1 statement make clear that there is no evidence that the Dolger's investment objectives changed in 2019. They did not, as they were required in contract in writing, write to JPMC to say anything had changed. The plaintiff's expert confirmed that when Mrs. Dolger became a joint owner, the investment objective did not change. So for all those reasons, that doesn't trigger a new suitability obligation. At bottom, the issue for plaintiffs is that while we cite state law cases about fiduciary duty, including POTSOS, which does define fiduciary duty by discretion, what plaintiffs cite are cases that are in a posit, Robin Hood, in terms of its merits, is in a posit. They cite SEC guidance and IAA guidance, which does not tell your honors what fiduciary duties are under state common law. And they cite cases that are on a motion to dismiss standard, which they suggest is the same as the standard on summary judgment. We would, of course, disagree with that. And in fact, one of the cases that plaintiffs cited is a great example of that. The PRCM case they cited, it was a dismissal on, it denied dismissal on a 12B6 standard. At summary judgment just a few months ago, they did dismiss on summary judgment the fiduciary duty claim in that case, saying, quote, fiduciary duty is not an all or nothing proposition. That is true here. They have to define the duty, they cannot, and they cannot define a duty that was breached. Thank you. Your time is up. Thank you, counsel. That concludes argument in this case.